J-S37030-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAVEL BELOUS | : | |
| | : | |
| Appellant | : | No. 301 EDA 2023 |

Appeal from the Judgment of Sentence Entered November 9, 2022
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0003551-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAVEL BELOUS | : | |
| | : | |
| Appellant | : | No. 302 EDA 2023 |

Appeal from the Judgment of Sentence Entered November 9, 2022
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0002652-2021

BEFORE:  BENDER, P.J.E., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED APRIL 8, 2024**

Pavel Belous ("Belous") appeals from the judgment of sentence imposed following his convictions for, *inter alia*, robbery, kidnapping, and attempted homicide.[1]  We affirm.

The trial court set forth the following factual and procedural history:

---

[1] **See** 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 2901(a)(2), 901(a).

[I]n March [] 2022, [Belous] entered two separate guilty pleas. On docket number 2652-2021, [Belous] pled guilty to[, *inter alia*,] [r]obbery – [t]hreat of [i]mmediate [s]erious [b]odily [i]njury, . . . [ and k]idnapping to [f]acilitate a felony . . .. On docket number 3551-2021, [Belous] pled guilty to two counts of [a]ttempted [h]omicide. [Belous was thirty-six years old at the time he committed these offenses.] The following summary of facts was established and agreed to by [Belous] at the [plea] hearing:

[Jarred Peglow ("Mr. Peglow") left home around 7:30 p.m. after completing schoolwork to go to a friend's house; that friend asked him for] a favor. [The friend] was going to pay [Mr. Peglow] $15 to take him to Dina's Café [to] buy some beer . . .. . . . While [the friend] was inside Dina's Cafe, [Mr. Peglow saw] a maroon SUV and a person sitting in the driver's seat of the vehicle with a mask over his face, staring at him. He thought it was off[,] but then didn't think too much of it. . . .

[That person was later identified as Belous.]

* * * *

[Mr. Peglow later] dropped off [his friend] at . . . home . . .. When [Mr. Peglow] did that [he], again, saw the maroon SUV pull into a driveway with its lights off. Again, Mr. Peglow thought it was off[,] but didn't think too much of it[,] and he left the area. Around 10:14 p.m., [Mr. Peglow] arrived at [a] McDonald's . . .. [After he got his meal, he parked by a dumpster and began to eat.] . . . [Belous] parked his SUV next to [Mr. Peglow's] vehicle, about two spaces over.

[Belous] entered the passenger's side of Mr. Peglow's vehicle[,] and immediately put a knife up against Mr. Peglow's face[,] and demanded that Mr. Peglow give him money. Mr. Peglow [only had $18 on him, and Belous] was not satisfied with it, so Mr. Peglow offered an additional $2 in coins . . ..

[Belous then] threatened [Mr. Peglow] in various ways. He [told] Mr. Peglow that he [was] going to slit his throat and burn his car so there [would not] be any evidence

of what he did. He [told] Mr. Peglow that he [would] not hesitate to kill [him] and that [he has] killed before.

Mr. Peglow [took] this seriously and [observed] what looked like to be dried blood on [Belous's] hands . . .. [Belous] then ordered Mr. Peglow to drive from the McDonald's to an ATM machine to get him more money . . .. They went to [a] Wawa . . .. [Belous told Mr. Peglow it was too busy and made him drive to] a different location[,] an isolated ATM where there were not so many people . . .. [The second] ATM [wa]s right across the street from [Wawa.]

[Belous then] made Mr. Peglow, at knife point, go to the ATM. . . . [Belous] told Mr. Peglow [that because Mr. Peglow had seen him without a mask, Belous] had to kill [Mr. Peglow] so he could not identify [him]. [Belous] threatened that, based on the blood on his hand, the knife in [Mr. Peglow's face and neck, [Belous] knew Mr. Peglow could identify him and said, "]I'm going to kill you.[")

[At the ATM], Mr. Peglow used his ATM card, and [Belous told] him to clear out his bank account. At the time, Mr. Peglow had $477 in his bank account that he [had] earned working full[-]time while he attended school. . . ..

[Belous was] still not satisfied. He still wanted more. He [told] Mr. Peglow [to drive them to his home so Belous could take more of his belongings.]

[However, prior to making Mr. Peglow drive home, Belous] initially told him to go back to McDonald's. They drove back to the McDonald's[, where they sat in the parking lot, and Belous went on] about how he intended to kill [Mr. Peglow], how he intended to take him back to his house and . . . rape [Mr. Peglow's] mother. [Belous said he was] going to cut her face off, slit her throat, and kill her after he kills him, then he was going to set their family home on fire and destroy the evidence so he couldn't be tracked . . ..

[Mr. Peglow tried] to bargain with [Belous] and [offered to give him his coin collection he had at home]. [Belous agreed,] so they went from McDonald's to the

- 3 -

Peglow residence. Prior to arrival, [Mr. Peglow attempted to dial 911] but it was a drop call. [However,] it alerted law enforcement [that something was amiss] . . . [Mr. Peglow] then told [Belous that he had to call his mother to let her know he was bringing someone home, and Belous let Mr. Peglow call her, but said, "P]ut it on speaker phone and don't tip her off about anything.["]

[Mr. Peglow made the call as he entered] the neighborhood. [His mother, Felicia Peglow ("Ms. Peglow"), thought] there was something [wrong because] it was night, [and Mr. Peglow] was in school, and did not [normally] bring people home like that. She thought it was odd. So, Ms. Peglow went out onto the front porch of her house . . ., and [had] a cigarette while waiting for her son to arrive.

Mr. Peglow pulled up to the residence[,] but did not pull up to where he normally parks, but pulled up across the street.. .. [Belous got out of the car and wanted Mr. Peglow] to leave the car on. [Mr. Peglow told Belous] that his car [wa]s [on its last leg] and would die . . .. He asked permission to turn the car off and get the keys. As [Mr. Peglow went] back to the car, [he] grabbed his boy scout knife . . . from the center console of his vehicle.

As [Belous] ran towards [Ms. Peglow], who was on the porch, [Mr. Peglow] stabbed [Belous] in the back. [Belous] [fell] down and [Mr. Peglow] ran to his mother, grabbed her, and forced her in the house. She didn't know what was going on . . .. [Mr. Peglow] immediately locked the door and called 911.

[Mr. Peglow told] 911 exactly what happened[:] that he was robbed and he was forced to go to his home. The person was going to kill him, that he stabbed [the person,] and that person was in the driveway . . ..

[Meanwhile, Belous dragged] himself back to [Mr. Peglow's] car because he believed that they keys were still in there and put himself in the driver's side of the vehicle.

Police [arrived] within a few minutes [and found Belous in Mr. Peglow's vehicle]. He was honking the horn [and was] obnoxious to the police on site .. . he [also] told

the police on scene and then at the hospital that he was the victim. He said he was kidnapped, he said that he was robbed, he said that Mr. Peglow intended to kill him . . .. [Belous maintained the] ruse from the time he was stabbed up until [just before the guilty plea].

N.T. 3/25/[]22, [at] 24-45.

Sentencing was deferred for approximately 90 days to obtain a presentence investigation report [("PSI")]. On November 9, 2022, th[e c]ourt sentenced [Belous] to four consecutive terms of incarceration of no less than ten (10) years to no more than twenty (20) years in a [s]tate [c]orrectional [i]nstitution, [each, for robbery and kidnapping at number 2652-2021, and two counts of attempted criminal homicide at number 3551-2021,] totaling forty (40) years to eighty (80) years of incarceration. [I]n November [] 2022, [Belous] filed a [m]otion for [r]econsideration of [s]entence, which th[e c]ourt denied . . ..

On January [6], 2023, [Belous] filed a [petition for post-conviction relief seeking] leave to file a [n]otice of [a]ppeal [*nunc pro tunc*]. . . . [U]pon agreement of the parties, th[e c]ourt granted [Belous's p]etition and reinstated [his] right to file [a n]otice of [a]ppeal *nunc pro tunc . . ..*

. . . [Belous] filed a [timely n]otice of [a]ppeal . . ..

Trial Court Opinion, 3/9/23, at 1-5 (some brackets and ellipses in original).

Both Belous and the trial court complied with Pa.R.A.P. 1925.

Belous raises the following issue for our review:

Did the lower court impose a functional life sentence that is inconsistent with the Sentencing Code?

Belous's Brief at 2.

In his sole appellate issue, Belous challenges the discretionary aspects of his sentence. Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. *See Commonwealth v. Perzel*,

291 A.3d 38, 46 (Pa. Super. 2023), *appeal denied*, 301 A.3d 426 (Pa. 2023).

Rather, before reaching the merits of a discretionary sentencing issue:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal[;] (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence[;] (3) whether appellant's brief has a fatal defect[;] and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code[.]

*Id*. (internal citation omitted). This Court has explained:

> . . . [A]n appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. [Additionally], the appellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. That is, the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process. We examine an appellant's [Pa.R.A.P.] 2119(f) statement to determine whether a substantial question exists. Our inquiry must focus on the **reasons** for which the appeal is sought, in contrast to the **facts** underlying the appeal, which are necessary only to decide the appeal on the merits.

*Commonwealth v. Christman*, 225 A.3d 1104, 1107 (Pa. Super. 2019) (internal citation omitted; emphases in original).

Regarding the Rule 2119(f) statement, this Court has provided:

> [T]he Rule 2119(f) statement must specify where the sentence falls in relation to the sentencing guidelines and what particular provision of the Code is violated (*e.g.,* the sentence is outside the guidelines and the court did not offer any reasons either on the record or in writing, or double-counted factors already considered). Similarly, the Rule 2119(f) statement must specify what fundamental norm the sentence violates and the manner in which it violates that norm (*e.g.,* the sentence is unreasonable or

the result of prejudice because it is 500 percent greater than the extreme end of the aggravated range).

*Commonwealth v. Clary*, 226 A.3d 571, 580 (Pa. Super. 2020) (internal citation omitted). "*We cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists*." *Commonwealth v. Crawford*, 257 A.3d 75, 78–79 (Pa. Super. 2021) (internal citation and quotations omitted; emphasis added). Further, we will not accept bald assertions of sentencing errors. *See Commonwealth v. Faison*, 297 A.3d 810, 835 (Pa. Super. 2023). A combined failure to refer to the guidelines, the particular provision of the Sentencing Code allegedly violated, or the fundamental norm the sentence violates results in a failure to present a substantial question. *See Clary*, 226 A.3d at 580; *accord Faison*, 297 A.3d at 836 (concluding the appellant failed to raise a substantial question to invoke our review where he did not "specify what factors in particular the [sentencing] court ignored, or why his circumstances justified the imposition of a concurrent sentence").

With these principles in mind, we examine Belous's Rule 2119(f) statement. Our review discloses that Belous has failed to raise a substantial question. Belous asserts "the trial court's sentence was excessive because it failed to consider the required statutory factors under 42 Pa.C.S.[A.] § 9721(b)." Belous's Brief at 9. Belous maintains that because of this asserted failure, the trial court imposed a sentence that will keep him imprisoned for longer than his projected life expectancy. *See id*. Belous presents a bald assertion that the trial court failed to consider the requisite

sentencing factors, and thereby imposed an excessive sentence; however, this Court will not accept a bald assertion of sentencing errors. *See Faison*, 297 A.3d at 835. We further note that Belous fails to refer to the guidelines, any particular provision of the Sentencing Code the trial court allegedly violated, or the fundamental norm his sentence violates. *See Clary*, 226 A.3d at 580. Thus, Belous has failed to raise a substantial question and we decline to review his challenge to the discretionary aspects of his sentence, and we affirm the judgment of sentence.[2]

_____

[2] We note that even had Belous raised a substantial question, he would be due no relief. The trial court imposed consecutive standard-range sentences. *See* N.T., 11/9/22, at 5-6, 48-49. Further, the trial court noted at sentencing that it had "received a [PSI] that is comprehensive, thorough, and very balanced in terms of giving [the trial court] all [it] need[s] in a case such as this." N.T., 11/9/22, at 38. The trial court is thus presumed to have considered Belous's mitigating information. *See Commonwealth v. Hill*, 210 A.3d 1104, 1117 (Pa. Super. 2019) ("Where the sentencing court had the benefit of a [PSI], we can assume [the court] was aware of relevant information regarding the defendant's character and weighed [it] along with mitigating statutory factors. [If] a sentence is within the standard range . . ., Pennsylvania law views the sentence as appropriate . . ..") (internal citations and quotations omitted). More specifically, the trial court considered the "horrifying" circumstances of the crimes; Belous's family support and recent familial losses; his juvenile adjudications and adult convictions; his prior enrollment in rehabilitative programs including violence prevention and drug and alcohol counseling; his high risk of reoffending; and the guidelines. *See* N.T., 11/9/22, at 38-41. The court also considered the victim impact evidence of Mr. Peglow and his mother, as well as the community's need for protection. *See id*. at 42, 44. In light of the trial court's thoughtful consideration of the sentencing factors, we reject Belous's assertion that the court "focused solely on retribution and the 'gravity of the offense as it relates to the impact on the life of the victim.'" Belous's Brief at 14 (quoting 42 Pa.C.S.A. § 9721(b)). *See also* Trial Court Opinion, 3/9/23, at 8-10 (synopsis of the trial court's reasons for the sentence); *Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa. Super.
*(Footnote Continued Next Page)*

Judgement of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>4/8/2024</u>

_____

2009) (holding that an appellant is due no relief where "[t]he sentencing court [did] not . . . give the mitigating factors as much weight as [the a]ppellant would have liked and decided . . . the facts did not warrant . . . a sentence lower than the standard range," because "[w]e cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court").